IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANCIS X. DOUGHERTY | : | CIVIL ACTION |
| | : | |
| v. | : | No. 12-1001 |
| | : | |
| THE SCHOOL DISTRICT OF | : | |
| PHILADELPHIA, et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                    **October 4, 2013**

Plaintiff Francis Dougherty sues the School District of Philadelphia (the District) and three current or former District Officials—Leroy Nunery, Estelle Matthews, and Arlene Ackerman[1] alleging violations of his First Amendment rights and the Pennsylvania Whistleblower Law. Dougherty's employment with the District was terminated after he spoke to the press and law enforcement regarding misconduct related to the award of a District contract for the installation of security cameras. Dougherty alleges his termination was in retaliation for his First Amendment protected speech and also violated the Pennsylvania Whistleblower Law.

Nunery, Matthews, and the District filed a joint motion for summary judgment, arguing (1) Dougherty could not show Nunery or Matthews took any adverse action against him in retaliation for his protected speech; (2) the District could not be held liable because Dougherty could not show his termination was the result an official policy or custom; (3) Dougherty could not show his protected speech caused his termination; and (4) Nunery and Matthews are entitled to qualified immunity. Antognoli also filed a motion for summary judgment, arguing Ackerman is entitled to qualified immunity as to Dougherty's First Amendment claim and Dougherty

---

[1] Because Ackerman died after this lawsuit was filed Anthony Antognoli, the personal representative of her estate, has been substituted as a defendant.

cannot show a causal connection between Dougherty's alleged whistleblowing and Ackerman's actions. This Court denied both motions for summary judgment by Order of September 18, 2013. The individual Defendants having taken an interlocutory appeal from the September 18, Order, insofar as it denied their motion for summary judgment based on qualified immunity, the Court now supplements the Order on the issue of qualified immunity.

**FACTS**[2]

The School District of Philadelphia previously employed Dougherty as Deputy Chief Business Officer for Operations and Acting Chief of Operations for the Office of the Deputy Superintendent. In this position, Dougherty was responsible for the District's operational departments, including Capital Programs, Transportation, Food Services, Facilities, Information Technology, and Grade and Space Planning. Dougherty reported to Leroy Nunery, the Deputy Superintendent.

The District's Office of Capital Programs was responsible for all capital works within the District, including developing projects, designing the work to be performed, soliciting bids for projects, and selecting the awardee. As of 2010, the District permitted prime contractors to bid on large capital projects only if they had been pre-qualified under the Office of Capital Programs's process. When exigent circumstances made it impossible to solicit competitive bids, and the District did not already have an open contract with a vendor for the type of work to be performed, the Office of Capital Programs would select a contractor from among vendors with which the Commonwealth had previously contracted to perform similar work, so long as the prior contract was obtained through a competitive bidding process. The Superintendent did not

---

[2] "On a motion for summary judgment, a district court must view the facts in the light most favorable to the non-moving party, and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

have substantive authority with regard to the design, bid award, or supervision of capital construction projects.

All of the District's contracts required approval from the School Reform Commission (SRC) pursuant to the following process:  When a proposed contract originated from the Office of Capital Programs, the office prepared a resolution defining the scope of the work and value of the proposed contract.  The Superintendent then reviewed and approved the resolution before it was presented to the SRC for consideration.  If the SRC approved the resolution, the parties would then finalize and execute the contract.

On September 2, 2010, Ackerman, who was then the District's Superintendent, called a school safety plan meeting to discuss the impending release of the Department of Education's (DOE) School Safety Annual Report.  At the meeting, which Nunery, Matthews,[3] and Dougherty attended, Ackerman instructed the Office of Capital Programs to develop a plan to replace older security cameras with new cameras at 19 schools the DOE had designated as "persistently dangerous" within 30 to 60 days.  The next day Dougherty called a meeting of individuals from the relevant departments to discuss implementation of the camera project.  Due to the short time frame for completion of the project, Dougherty and his team decided to forego the standard competitive bidding process and instead work with a contractor that already had an existing state contract secured via a competitive bidding process.  Following this meeting, Amy McCole, the District Senior Information Technology Manager, contacted Security Data Technologies (SDT) to request an expedited proposal for the camera project.  SDT was chosen from a list of approved vendors because it had a positive track record with the District, knowledge of District technology and camera systems, and an existing state contract involving camera systems.

---

[3] Matthews was the Chief Talent and Development Officer, the District's most senior human resources executive.

SDT conducted preliminary work on the proposal, drawing up blueprints, roughing out plans, identifying and contacting potential subcontractors, and making budget estimates. Based on this work, Dougherty and his team estimated the project would cost up to $7.5 million and prepared a proposal for the SRC, including an SRC resolution and a Surveillance Cameras Implementation Plan (the Plan). The Plan stated the rate of subcontractor participation by minority-owned firms would be 33% and the rate of subcontractor participation by women-owned firms would be 34%. Dougherty kept Nunery informed of his team's progress and emailed the completed Plan to him for approval on September 17, 2010, in order to present it at the SRC's September 22, 2010, meeting. Dougherty's email stressed the importance of obtaining advance approval from the SRC rather than seeking ratification after SDT started work. Dougherty received no response to his email from Nunery, Ackerman, or either of their staffs, and the Plan was not presented at the September 22 meeting.

Rather, on September 23, 2010, Ackerman convened a meeting, during which she rejected the implementation plan for lack of minority participation and directed that IBS Communications, Inc. (IBS), a minority-owned firm, be made the prime contractor on the security camera project. The September 23 meeting was attended by Dougherty, Jeff Cardwell (the Senior Vice President of Facilities), Nunery, John L. Byars (the District's Procurement Director), a Special Assistant to Ackerman, and an intern. Nunery supported Ackerman's directive that IBS be made the prime contractor on the camera project. As of the September 23 meeting, there had been no review or consideration of IBS's qualifications to handle the security camera project as the prime contractor or whether IBS could accomplish the project on budget and on schedule. At this meeting, Ackerman also transferred management responsibility for the

camera project from Dougherty and his team to Byars, even though Byars's department did not usually handle this type of project.

Dougherty alleges Ackerman awarded the contract to IBS because it was a minority-owned business to which she had a personal connection, in violation of a numerous laws, policies, and procedures. Ackerman had previously directed Dougherty to find work for IBS. In 2009 she called Dougherty and ordered him to find work for IBS on a camera project at South Philadelphia High School. When Ackerman first directed Dougherty to find work for IBS, the only work available was a minor project drawing schematics. Even though this project had already been subcontracted and Dougherty and his staff were unfamiliar with IBS, Dougherty reassigned the job to IBS in accordance with Ackerman's orders. The District ultimately paid IBS $12,000 to complete the schematics, which would have cost the District only $1,000 if the work had been completed by the company already retained.

Prior to 2009, IBS had done no work for the District. It had no experience with the District's specifications for surveillance cameras, or with the District's buildings and work protocols. IBS did not have an existing contract with a state agency awarded pursuant to a competitive bidding process, nor did it have an existing contract with the District to perform emergency work of the type needed at South Philadelphia High School. Finally, IBS was not prequalified by the District to bid on capital projects. Following the 2009 project, IBS still lacked a state contract awarded pursuant to a competitive bidding process, nor had it been prequalified by the District to bid on capital projects. Thus, IBS remained ineligible for no-bid contracts.

Both Ackerman and Matthews had personal relationships with IBS personnel. Ackerman knew the owner of IBS, Darryl Boozer, and socialized with him outside of work. Matthews had

known Yusaf Ali, a principal with IBS, since high school.  Following IBS's completion of work for the 2009 camera project at South Philadelphia High School, Boozer counseled Ackerman regarding the need for quality control for any future camera projects.

IBS sent its plan for the camera project to the District on October 12, 2010.  The plan did not state any participation rates for minority-or women-owned businesses.  Ackerman presented IBS's plan to the SRC for review at its October 13 meeting and asked the SRC to ratify the plan at its upcoming voting meeting on October 20, which it did.  Byars and District counsel worked with IBS to draft a contract, which was executed on November 17, 2010, but backdated the start date for the work to September 22, 2010.

In November 2010, Boozer called Ackerman to complain that IBS was not receiving the necessary support from the District staff.  Ackerman asked Nunery to help with this problem. Nunery called a meeting of camera project personnel, including IBS staff, but excluding Dougherty.  A member of Dougherty's staff later informed him that Nunery was very critical of the District staff and blamed Dougherty for obstructing IBS's work.  Dougherty sent Nunery an email requesting a meeting to discuss these issues, stating he was "very, very upset," and that to imply he has been an obstacle was "insulting to [his] professionalism, [his] commitment to the team, and [his] desire to get things done here."  Defs.' Mot. for Summ. J., Ex I.[4]

On November 10, 2010, Dougherty submitted a report to the FBI Tips and Public Leads website concerning the misuse of taxpayer dollars and other wrongdoing in connection with the IBS contract award.  The FBI began an investigation as a result of this report.  Also on

---

[4] Citations to Defendants' Motion for Summary Judgment are to the motion filed by Nunery, Matthews, and the District as Antognoli joined the statement of facts submitted by the other Defendants.

November 10, Dougherty met with reporters from *The Philadelphia Inquirer* to discuss Ackerman's conduct and the events surrounding the award of the camera project to IBS.

On November 15, 2010, SDT contacted McCole and informed her the company had given an interview to the *Inquirer*. McCole told Melanie Harris (the District's Chief Information Officer) and Robert Westall (Deputy Chief Information Officer) about the upcoming article, and the three of them advised Dougherty about it. Dougherty, Harris, and Westall brought the article to Ackerman and Nunery's attention, causing Ackerman to become very upset. Ackerman stated "she was sick of all the School District business going to majority vendors and things were going to change." Pl.'s Opp'n to Mot. for Summ J., App. at 13-14, 65. Ackerman also yelled at Dougherty, telling him that "when SDT was chosen as the vendor Dougherty had the 'wrong people in the room' because there was 'only one black man and he was probably too scared to tell you the right thing to do.'" *Id.*

On November 28, 2010, the *Inquirer* published the first in a series of articles and editorials on the security cameras project, headlined "Ackerman Steered Work, Sources Say." *Id*. at 174. This article stated the District appeared to have violated state guidelines and District policies and procedures by directing the award of the contract for the camera project to IBS.

On November 29, 2010, Dougherty was called into a meeting with Ackerman and Nunery. At the meeting, Ackerman demanded to know why Dougherty had told his staff about IBS, vowed to get to the bottom of who was leaking information, and stated she could fire him over this information getting to the press. Ackerman also demanded Dougherty decide whether he was going to remain with the District or resign, stating he was either "on the team and keeping things confidential" or that he should "resign and get out." *Id*. at 1. Ackerman and Nunery gave Dougherty one hour to respond, and he eventually provided a letter stating he

would remain with the District. Nunery indicated to Dougherty that he supported Ackerman's actions.

On December 1, 2010, Michael Davis, the District's General Counsel, began interviewing witnesses and District employees because of the *Inquirer* articles. Davis testified at his deposition he was looking into the allegations of improprieties in the procurement process and possible violations of District policy. Defs.' Mot. for Summ. J., Ex. B at 25. Davis interviewed Dougherty during this preliminary investigation, taking 12 pages of handwritten notes. Defendants claim this preliminary investigation made apparent the need to further investigate the propriety of the current procurement procedures and whether an "old boys network" was still in operation. *Id*. at 57-58.

In addition to making a report to the FBI, Dougherty contacted State Representatives Michael McGeehan and Paul Clymer regarding the IBS contract and submitted a hotline report to the Office of Inspector General for the U.S. Department of Education. On December 3, 2010, Thomas Gluck, the Acting Secretary of Education for Pennsylvania wrote to Ackerman citing "concerns that have been raised regarding procurement procedures" and asking Ackerman to provide him with certain information about the camera project. Pl.'s Opp'n to Mot. for Summ. J., App. at 318. Gluck also noted his office had received a letter from Representative McGeehan about this matter.

On Sunday, December 12, 2010, Ackerman called Matthews at home. Matthews was the District's Chief Talent and Development Officer, the District's most senior human resources executive, and reported directly to Ackerman. Dougherty was not in Matthews's direct line of supervision. Matthews played no role in the award of contracts, nor was she a subject of any newspaper article or investigation related to the camera project. She was, however, a close

advisor to Ackerman, and felt it was part of her job to challenge Ackerman. During the call, Ackerman discussed the press leaks and asked Matthews "to tell her if she was wrong," but she felt that certain individuals should be placed on administrative leave until they had time to thoroughly investigate what happened. *Id*. at 80.

On December 13, 2010, Ackerman held a meeting with her direct reports, including Nunery and Matthews. Ackerman expressed her anger about the press leaks and stated she wanted "a full-blown investigation conducted and we need to put some people on administrative leave until we can determine what's going on." *Id*. at 114. Ackerman further asked the group who should be suspended and subject to the investigation. The group came up with six names, including Dougherty's. Following the meeting, Matthews, Davis, and another member of the Office of General Counsel drafted suspension letters for the six employees, stating the suspensions were necessary due to an apparent "inappropriate sharing of confidential District information surrounding the awarding of the installation of the surveillance camera project," and the resultant need to investigate. *Id*. at 178. Matthews signed the letters. Later that day, Matthews met with Dougherty, gave him the suspension letter, and informed him he was suspended pending an investigation into the leak. During the meeting, Dougherty informed Matthews he "in fact was the leak and had gone to Federal Law Enforcement Authorities on the IBS project." *Id*. at 253. Following this meeting, a police officer escorted Dougherty from the building.

The District Code of Ethics provides protections to whistleblowers under its confidentiality provision: "*Confidential Information.* School District employees shall abide by all laws and District policies concerning confidential information . . . . Nothing in this provision shall be interpreted as prohibiting the practice of 'whistleblowing.'" *Id*. at 17. When asked

about the reference to whistleblowing in the Code at her deposition, Matthews stated she was "not really sure" what it meant, but she agreed no one in the District ever told her the term "the practice of whistleblowing" did not include talking to the press about wrongdoing. *Id.* at 267. Dougherty understood the whistleblower exception to be very inclusive, covering reports made to both law enforcement and the press.

On December 17, 2010, Davis retained Michael Schwartz of Pepper Hamilton LLP to conduct an investigation and prepare a report.[5] As part of the investigation, Davis instructed Schwartz to find out who was the source of the unauthorized leaks.[6] Defendants maintain Davis defined the scope of the investigation for Schwartz but left the investigation plan to Schwartz himself. Defs.' Mot. for Summ. J., Ex. C at 19. Schwartz stated he was charged to find out "[a]ll of the facts surrounding the decision to award these contracts, whether any of those decisions were somehow compromised [][and] . . . whether anyone at the School District had violated School District policies or Pennsylvania or federal." *Id.* at 11. Schwartz believed, "if there was inappropriate disclosure of confidential District information [he] would consider that

---

[5] Defendants argue the reason for bringing in an outside investigator was to examine the method for awarding contracts, and to determine whether there had been any improper disclosures of confidential information, but not specifically to investigate any leaks to the press. Thus, the nature of the investigation is a disputed fact.

[6] There is a significant factual dispute as to whether Schwartz was specifically instructed to find the source of the leak. Schwartz maintains he was not looking to determine who leaked information to the press, and testified any search for a press leak would likely have come at a third phase of investigation, which was never reached. Dougherty disputes this and alleges Schwartz's investigation actively addressed Ackerman's order to find the press leak. In support of this allegation, Dougherty cites to Schwartz's handwritten notes, which list "who is leaking!" as the fourth of four items listed under phase I of the investigation. Pl.'s Opp'n to Mot. for Summ. J., App. at 28. Both Schwartz and Davis also maintain they never developed a belief or drew a conclusion regarding who disclosed information to the press. Dougherty argues both his termination letter and the Pepper Report demonstrated through code words their belief that Dougherty was the leak. For purposes of summary judgment, the Court accepts Dougherty's version of the facts.

as a potential violation of School District policies . . . subsumed in part of that investigation." *Id*. at 22. Schwartz was also tasked with determining whether the six employees who had been placed on administrative leave should be reinstated.

On December 20, 2010, Schwartz instituted a "freeze" on the District's server data and identified approximately 30 employees he wanted to interview, including Dougherty. On January 6, 2011, Dougherty's counsel, Lisa Mathewson, contacted Schwartz to inform him of her representation of Dougherty. Schwartz told Mathewson the scope of his investigation and communicated his desire to learn about the circumstances surrounding the relevant contract awards. Schwartz also informed Mathewson that he did not know what, if any, negative consequences would occur if Dougherty did not agree to talk with him. On January 13, 2011, Mathewson informed Schwartz that Dougherty declined to participate in the investigation because he "has been communicating as a whistle-blower with law enforcement and other government representatives." *Id*. at 78-79.

On January 6, 2011, Davis issued a memo to all central office employees, reminding them to abide by certain standards, including maintaining confidentiality. The memo further stated employees "shall not disclose confidential information concerning property, personnel matter, or affairs of the District or its employees, without proper authorization," and cited to the enforcement section of the Code of Ethics, which stated violations of the Code may result in administrative or disciplinary actions including suspension or dismissal. Pl.'s Opp'n to Mot. for Summ. J., App. at 179. The memo made no mention of an exception for whistleblowers.

In his January 14, 2011, interview with the Pepper Hamilton investigators, Nunery stated he had concerns that Dougherty was leaking information to the press based on language he had heard Dougherty use in a conversation, which was similar to language that later appeared in an

*Inquirer* article.  In her February 1, 2011, interview with the Pepper Hamilton investigators, Matthews stated she was concerned about Dougherty based on forensic findings suggesting he was the press leak.  On February 16, 2011, Schwartz presented his complete report and findings to the SCR.  On February 17, 2011, Dougherty received a notice requesting that he participate in a conference to discuss "improper work performance," which he declined.  *Id*. at 230.

On March 3, 2011, Pepper Hamilton issued its report with findings and recommendations to the District (Pepper Report).  The Report concluded there was no evidence of unlawful motive in the award of the security camera contract.[7]  The Report also included four findings regarding Dougherty:  (1) on September 9, 2010, he improperly disclosed a preliminary plan for the surveillance camera upgrade via an email sent to citythoroughbred@yahoo.com; (2) beginning on November 10, 2010, he improperly sent over 50 emails from his work email account to his personal email account relating to the camera project and dating back to September 7, 2010; (3) also on November 10, Nunery criticized District staff members for failing to adequately address issues regarding the implementation of the IBS contract, which Dougherty claimed insulted his professionalism; and (4) by improperly disclosing confidential information, Dougherty violated the confidentiality requirement set forth in the District Employee Code of Ethics.  Schwartz further stated "Mr. Dougherty['s] [refusal] to participate in the investigation, . . . the underlying nature of the documents that were disclosed, [and] the various timeframes in which they were disclosed, was a violation of his . . . duty of integrity owed to the School District and other specific provisions of the Employee Code of Ethics."  Defs.' Mot. for Summ. J., Ex C. at 43.

---

[7] Dougherty disputes this finding, alleging the Pepper Hamilton investigators had evidence of unlawful motive, but chose not to credit such evidence.  This evidence included reports from various witnesses that Ackerman was not happy about contracts being awarded to majority vendors and directed the award of the contract to IBS based on racial preference and a personal relationship with the owner.

Dougherty asserts the citythoroughbred@yahoo.com email account is a personal email address[8] which he used during the preliminary stages of the camera project to forward a camera security plan document so he could work at home. Pl.'s Opp'n to Mot. for Summ. J., App. at 145-158. The document Dougherty sent to this address consisted of a preliminary plan for the camera project, was sent before any controversy had arisen, and contained no privileged information.[9]

On March 23, 2011, Ackerman, Nunery, and Matthews met with Davis to discuss the findings of the Pepper Report and the District's options regarding Dougherty. They discussed Schwartz's findings about the large volume of emails and documents Dougherty forwarded to his private email account and his possible reasons for doing so, given that all employees had remote computer access to work from home if necessary, concluding there was no business reason for him to do this. See *id.* at 181 (Matthews Decl. ¶ 17-18). Nunery admitted that when he left the meeting, he expected Dougherty to be terminated. Following this discussion, Ackerman recommended Dougherty's termination to the SRC.

On March 30, 2011, Matthews notified Dougherty by letter that the District was going to recommend his termination to the SRC. Matthews prepared the letter with the assistance of the Office of General Counsel. The letter stated the District was recommending termination because Dougherty breached the confidentiality section of the Code of Ethics when he forwarded

---

[8] Defendants claim the email address was linked to an individual named Matt Dumont, who they were never able to locate or identify. For purposes of summary judgment, the Court accepts Dougherty's claim that the email address belonged to him.

[9] There was no District policy prohibiting employees from sending District documents to a personal email address. When asked if there was a rule against emailing work to a personal email address so the employee could work on material at home, Matthews responded, "not to my knowledge. Pl.'s Opp'n to Mot. for Summ. J., App. at 107. Furthermore, both Matthews and Nunery admitted to taking work home with them.

documents, without authorization, outside of the District to someone who did not have a right to see them,[10] and because his refusal to cooperate prevented the District from reaching any other conclusion. On April 27, 2011, based on Ackerman and the District's recommendation, the SRC terminated Dougherty's employment.

Dougherty filed the instant lawsuit on February 24, 2012, asserting claims of First Amendment retaliation pursuant to 42 U.S.C. § 1983, and violations of the Pennsylvania Whistleblower Law, 43 Pa. Cons. Stat. Ann, § 1421 *et seq*., against the District, Ackerman, Nunery, Matthews, the SRC, and four individual SRC members. On December 14, 2012, the claims against the SRC and SRC members (Counts V, VI, VII, XI, and XII) were dismissed, leaving only the claims against the District, Ackerman, Nunery, and Matthews (Counts I, II, III, IV, VIII, IX, and X). Because Ackerman died in February 2013, Anthony Antognoli, the personal representative of the estate Ackerman's estate, was substituted as a defendant on August 6, 2013. The District, Nunery and Matthews thereafter filed a joint motion for summary judgment on August 14, 2013. Due to his late substitution, Antognoli missed the original deadline for filing dispositive motions; however, this Court granted Antognoli leave to file a motion for summary judgment on September 9, 2013. On September 18, 2013, this Court issued an Order denying both motions for summary judgment. That same day, Defendants filed a notice of interlocutory appeal as to this Court's denial of their motions on qualified immunity grounds. Pursuant to the Third Circuit Court of Appeals Local Appellate Rule 3.1, the Court issues this Memorandum to further explain its ruling on the issue of qualified immunity.

---

[10] Schwartz testified he was never able to determine to whom Dougherty was disclosing information.

**DISCUSSION**

A motion for summary judgment shall be granted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court "must view the facts in the light most favorable to the non-moving party, and must make all reasonable inferences in that party's favor." *Hugh*, 418 F.3d at 267; s*ee also McKee v. Hart*, 436 F.3d 165, 169 (3d Cir. 2006) (noting where the defendant seeks qualified immunity at the summary judgment stage, the court looks at the facts as presented by the plaintiff). To defeat a summary judgment motion, the non-moving party "must rely on affidavits, depositions, answers to interrogatories, or admissions on file" to show there is a genuine issue of material fact. *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 199 (3d Cir. 2001) (quotation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Qualified immunity shields government agents from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The determination whether a public official is entitled to qualified immunity involves a two step-analysis. *Reilly v. Atlantic City*, 532 F.3d 216, 223 (3d Cir. 2008). First, the court must "decide 'whether a constitutional right would have been violated on the facts alleged.'" *Doe v. Groody*, 361 F.3d 232, 237 (3d Cir. 2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001)). Next, the court

determines whether the constitutional right is clearly established, such that a reasonable official would understand what he is doing violates that right and has been put on notice that his conduct is constitutionally prohibited. *McKee*, 436 F.3d at 173.

In order to establish the existence of a constitutional violation, Dougherty must establish First Amendment retaliation. There are three factors to consider for a public employee's claim of First Amendment retaliation. First, the employee must show his activity is protected by the First Amendment. *Gorum v. Sessoms*, 561 F.3d 179, 185 (3d Cir. 2009). "A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have "an adequate justification for treating the employee differently from any other member of the general public" as a result of the statement he made [i.e., the *Pickering* balancing test]." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2005)). Next, the protected activity must have been a substantial or motivating factor in the alleged retaliatory action. *Baldassare v. New Jersey*, 250 F.3d 188, 194-95 (3d Cir. 2001). Finally, if the plaintiff establishes these elements, the burden shifts to the defendant to show the same action would have been taken even if the plaintiff had not engaged in the protected activity. *Gorum*, 561 F.3d at 185. The first factor is a question of law, while the second and third stages of this analysis are questions of fact for the jury. *Green v. Phila Hous. Auth.*, 105 F.3d 882, 885 (3d Cir. 1997).

Therefore, the threshold question for a First Amendment retaliation claim and whether Dougherty has shown the existence of a constitutional violation is whether his speech is protected by the First Amendment. *Watters v. City of Phila.*, 55 F.3d 886, 892 (3d Cir. 1995). The Supreme Court has held that when "public employees make statements pursuant to their

official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti* 547 U.S. at 421.[11] Thus, the Court "must [first] determine whether the employee was speaking 'as a citizen' or by contrast, pursuant to his duties as a public employee." *Foraker v. Chaffinch*, 501 F.3d 231, 243 (3d Cir. 2007) (quoting *Sigsworth v. City of Aurora*, 487 F.3d 506, 509-10 (7th Cir. 2007)), *abrogated on other grounds by Borough of Dureyea v. Guarnieri*, 131 S. Ct. 2488 (2011). The Third Circuit has expanded the Supreme Court's holding in *Garcetti*, concluding speech might be considered part of an employee's official duties when it is derived from "special knowledge or "experience" acquired on the job. *Id.* at 240. The inquiry regarding the nature of an employee's official duties "is a practical one." *Garcetti*, 547 U.S. at 424; *see also Moore v. Darlington Twp.*, 690 F. Supp. 2d 378, 389 (W.D. Pa. 2010) ([T]he standard . . . is whether the speech in question was made pursuant to the practically understood or expected duties of a plaintiff's employment.")

In support of their argument that Dougherty's speech to the press fell within the scope of his duties, Defendants rely heavily on the Third Circuit's expansion of *Garcetti* in *Foraker*.[12]

---

[11] Ceballos, the plaintiff in *Garcetti,* was a deputy district attorney who composed a memo recommending dismissal of a case because of inaccuracies in an affidavit used to obtain a critical search warrant. 547 U.S. at 413-14. Notwithstanding Ceballos's recommendation, the prosecution of the case proceeded and Ceballos was called as a defense witness. *Id*. at 414-15. Following the trial, he was reassigned, transferred to another courthouse, and denied a promotion. *Id*. at 415. The Supreme Court held Ceballos's memorandum was not protected speech because it was prepared pursuant to his official duties as a prosecutor. *Id*. at 421.

[12] In *Foraker*, three Delaware State Police Officers became concerned about exposure to unsafe metals and related health issues caused by inadequate maintenance at a shooting range facility run by police. 501 F.3d at 233. The officers reported these concerns to their superiors and were eventually ordered to speak to a State Auditor. *Id*. The Third Circuit held these statements were made pursuant to the officers' job duties, as environmental concerns at the range fell within the scope of their duties. *Id*. at 241-42. Furthermore, by reporting these concerns up the chain of

Defendants' argue because the content of Dougherty's reports to the press involved information he only learned because of his position he was necessarily speaking within the scope of his duties, as *any* speech directly related to an employee's official job duties, specialized knowledge or experience gained from those duties is unprotected. *See Brown v. Montgomery Cnty.*, 470 F. App'x 87, 89 (3d Cir. 2012) (finding an employee's position as an Emergency Dispatch Center supervisor required him to ensure the Computer-Aided Dispatch system function properly, gave him intimate knowledge of and experience with the system, and rendered his speech to the press regarding problems with the system entirely job related, and thus, made pursuant to his official duties); *Gorum*, 561 F.3d at 186 (finding it was plaintiff's "special knowledge of, and experience with," the school's disciplinary code that made him de facto advisor to all students with disciplinary problems and coupled with his position as a professor and department chair, enabled him to speak and aid a student at a disciplinary hearing). The broad reading of *Garcetti* and *Foraker* advocated by Defendants would foreclose public employees from speaking out on any issue of public concern learned in the course of their work. Yet, courts have found that public officials are uniquely qualified to comment on issues of public concern, precisely because of the access to information their positions afford them. *See San Diego v. Roe*, 543 U.S. 77, 80 (2004) ("The Court has recognized the right of employees to speak on matters of public concern, typically matters concerning government policies that are of interest to the public at large, a subject on which public employees are uniquely qualified to comment." (citations omitted)); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 572 (1968) ("[T]eachers are . . . the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak

---

command and reporting to a State Auditor under order, the officers spoke pursuant to their duties as government employees, and their speech was therefore not protected. *Id*. at 243.

out freely on such questions without fear of retaliatory dismissal."); *Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006) (finding it was the plaintiff's responsibility "as a citizen" to expose the malfeasance of officials to broader scrutiny).

While the internal/external nature of an employee's speech is "not dispositive," *Garcetti*, 547 U.S. at 420, Defendants' argument that because Dougherty worked closely with the camera project, any speech related to the project is de facto unprotected, expands *Garcetti* and *Foraker* too far. *See id.* at 421 (noting that the memo concerned the subject matter of the plaintiff's employment was not dispositive); *Gorum*, 561 F.3d at 185-86 (analyzing plaintiff's speech related to special knowledge or experience acquired through his job as just one consideration in determining whether the speech fell within plaintiff's official duties); *Freitag*, 468 F.3d at 545 (finding a public employee did not lose her right to speak as a citizen because the speech concerned the subject matter of her employment). Moreover, it cannot be said it was within the scope of Dougherty's routine duties to recognize and report his superior's misconduct as there is no evidence in the record that Dougherty was under any obligation to report his superior's alleged misconduct up the chain of command. *See Sexton v. Cnty. of York*, No. 12-402, 2012 WL 2192250, at *4 (M.D. Pa. June 14, 2012) (stating the critical fact is whether the employee's speech is within the scope of the employee's "routine operations").

Dougherty argues the relevant inquiry is not into the content of the speech but the context, and because it was not within his job duties to report information to the press, he was necessarily speaking as a public citizen. This argument also misses the mark. Dougherty's bright line distinction between internal and external speech (i.e., between speech within the employee's organization and outside the organization) is not the standard by which the Court analyzes whether an employee is speaking as a citizen. *See Garcetti*, 547 U.S. at 420 (noting the

internal nature of the speech was "not dispositive"); *see also Foraker*, 501 F.3d at 241 (same). The fact Dougherty learned about the alleged misconduct while working as a district employee is not dispositive, but neither is the fact that Dougherty reported the alleged misconduct to the press.

The dispositive fact is that while Dougherty learned the relevant information because of his position, taking into account the nature of the speech and the significant interest the public had in learning about this information, there is no evidence suggesting it fell within the scope of his duties to recognize the alleged misconduct as such and report it, whether to the media or any other party. Unlike the plaintiffs in *Garcetti*, *Foraker*, and *Gorum*, nothing about Dougherty's position compelled or called for him to provide or report this information. Furthermore, Defendants point to no evidence suggesting Dougherty was required to report misconduct by a supervisor up the chain of command, and moreover, do not even argue Dougherty was obligated to report this information.

An additional factor to consider is that the Supreme Court itself stated the official duties limitation should not be read as unduly restrictive, as the limitation "reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti*, 547 U.S. at 422. It is clear the District neither commissioned nor created the type of report Dougherty made. To the contrary, it appears the District actively discouraged employees from speaking with the press. Accordingly, while Dougherty obtained the relevant information in the course of his work, it cannot be said his reports to the press of alleged racial preference and misconduct in the District's procurement process fell within the scope of his duties. As the Acting Chief of Operations, Dougherty was responsible for coordinating the operations of the departments that reported to him and undoubtedly learned about the camera project because of

his position; however, based on a practical inquiry into Dougherty's job requirements, this Court finds that such speech was not conducted pursuant to his official duties but rather as a public citizen.

Having determined Dougherty was speaking as a public citizen, the Court next analyzes whether the speech addressed a matter of public concern. Speech addresses a matter of public concern when it relates to an issue of "political, social or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1982). Whether this standard is satisfied "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Rankin v. McPherson*, 483 U.S. 378, 385 (1987). Defendants do not argue that Dougherty's speech did not relate to a matter of public concern, and this Court finds that alleged misconduct by the Superintendent regarding the award of a District contract is a matter of public concern. *See Baldassare*, 250 F.3d at 195 (noting matters of public concern include attempts to bring to light potential wrongdoing by government officials).

The final prong of the protected speech analysis is the *Pickering* balancing test, which requires a court to weigh the employee's interest, as a citizen, in commenting upon matters of public concern against the state's countervailing interest as an employer in promoting workplace efficiency. *Pickering*, 391 U.S. at 568; *see also Grigsby v. Kane*, 157 F. App'x 539, 542 (3d Cir. 2005) (characterizing the relevant inquiry as whether there is disruption to the employer's interest in "providing efficient and effective services to the public"). The employee's speech is not considered in a vacuum, and a pertinent consideration is whether the speech has a "detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388; *see also Sprague v. Fitzpatrick*, 546 F.2d

560, 564 (3d Cir. 1976) (finding the "hierarchical proximity of the criticizing employee to the person or body criticized" to be a great consideration); *Curinga v. City of Clairton*, 357 F.3d 305, 313 (3d Cir. 2004) (finding the plaintiff's speech was not protected because the strong government interest outweighed the employee's interest in political speech, where the employee occupied a position requiring "confidentiality and a close working relationship with city council members to effectively implement their policies"). The degree of disruption that must be shown depends on the level of First Amendment protection the speech is accorded. *O'Donnell v. Yanchulis*, 875 F.2d. 1059, 1061 (3d Cir. 1989) (finding the court must take into account the public's interest in learning about the information). In other words, "[t]he 'more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made.'" *McGreevy v. Stroup*, 413 F.3d 359, 365 (3d Cir. 2005) (quoting *Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992)). It is thus significant that the speech at issue in this case "involve[es] government impropriety" and therefore "'occupies the highest rung of First Amendment protection.'" *Id.* (quoting *Swineford v. Snyder Cnty.*, 15 3d. 1258, 1274 (3d Cir. 1994)).

Defendants argued that given Dougherty's position as the Deputy Chief Business Officer and Acting Chief of Operations, the leaks of confidential information in this case undermined the interests and regular operation of the District. Defendants also argue Dougherty's negative statements about Ackerman "undermined the working relationship and personal loyalty and confidence between [Dougherty and Ackerman]," disrupting their work environment. Defs.' Mot. for Summ. J., at 10, ECF. No. 139. Dougherty denies having a close working relationship with Ackerman, noting he was one of 30 members of Ackerman's cabinet and before Ackerman directed him to find work for IBS during the 2009 project, they had never spoken directly.

Furthermore, Dougherty asserts there has been no showing that his speech impeded the performance of his duties. To the contrary, Dougherty notes Defendants "have consistently taken the position that the camera project was successfully concluded 'on time and under budget.'" Pl.'s Opp'n to Mot. for Sum. J. at 15, ECF No. 140. He further contends that any disruption was caused by Ackerman's interference with the camera project and subsequent hunt for the press leak. Dougherty concedes he directly reported to Nunery, but maintains their working relationship was not one of confidants; rather, Dougherty merely kept Nunery informed about the operations of his department. *Id*. at 12. There has been no argument that Dougherty had any type of working relationship with Matthews.

Viewing the evidence in the light most favorable to Dougherty, this Court finds the *Pickering* factors weigh in favor of Dougherty, with the nature of Dougherty's speech tipping the scale in his favor. *See Watters*, 55 F.3d at 895 (concluding the public's significant interest in learning about problems impacting a government institution rendering such speech a matter of public concern). Allegations of misconduct by public officials, such as the Superintendent of the Philadelphia School District, are of considerable interest to the public. *See O'Donnell*, 875 F.2d. at 1062 ("The public has a significant interest in encouraging legitimate whistleblowing so that it may receive and evaluate information concerning the alleged abuses of . . . public officials."); *see also Garcia v. Newton Twp.*, 819 F. Supp. 2d 416, 424 (E.D. Pa. 2011) (finding an employee's speech about alleged misconduct by township employees is protected by the First Amendment because of its interest to the general public).

Additionally, the evidence presented does not compel a conclusion that Dougherty and Defendants had such close working relationships that his reports to the press would undermine their ability to work together. *See Watters*, 55 F.3d at 897-98 ("[M]erely saying that the

relationship will be undermined [by the public speech] does not make it so."). Dougherty did not function, nor has there been any argument that he functioned, as Ackerman or Nunery's alter-ego. S*ee Curinga*, 357 F.3d at 313 (finding the *Pickering* balancing test weighed in favor of the employer where the employee's speech was political and his position was a "high-level policy making appointive position," requiring "confidentiality and a close working relationship with city council members to effectively implement their policies"); *Sprague*, 546 F.2d at 565 (3d Cir. 1976) (finding speech is not protected because of irreparable breach between plaintiff and his employer where plaintiff was the direct administrative and policy-making subordinate of his employer). Moreover, Dougherty was not in a policy-making position and, while he worked to implement the policies of Ackerman, he was one of many administrators whose job involved implementing the policies of the Superintendent.

Finally, while it is not disputed there was disruption to the School District, ultimately leading the administration to bring in an outside law firm to investigate, any such disruption is outweighed by the interest in exposing alleged misconduct by the Superintendent of the Philadelphia School District. Moreover, it is disputed how much of the disruption was the result of the press leaks. *See Watters*, 55 F.3d at 897 ("Disruption caused by actions independent of the speech at issue cannot be equated with disruption caused by the speech itself."). Dougherty claims the disruption arose from Ackerman's misconduct and her subsequent hunt to find the leak rather than from the leaks themselves, while Defendants maintain the sole cause of disruption was the leaks. Viewing the evidence in the light most favorable to Dougherty, the Court cannot conclude his actions were so disruptive as to outweigh Dougherty's interest in speaking. Accordingly, the *Pickering* balance tilts in Dougherty's favor.

Having established Dougherty's speech is protected, the Court now addresses the remaining two factors of the First Amendment retaliation analysis to determine whether there was a constitutional violation. Dougherty must next establish his protected speech was a substantial or motivating factor in his termination. *Baldassare*, 250 F.3d at 194-95. Defendants argue Dougherty cannot establish his speech was a motivating factor because Defendants relied on the findings and recommendations of Schwartz in deciding to recommend Dougherty's termination and there is no evidence that Defendants suspected or concluded Dougherty was the source of the press leak. Defs.' Mot. for Summ. J., at 10-11, ECF. No. 83. This Court disagrees. Viewing the facts in the light most favorable to Dougherty, a reasonable jury could find Defendants knew he was the leak and acted with an improper motive. Moreover, when entitlement to qualified immunity depends on the disputed question of motivation for an adverse employment action, this question is inappropriate for summary judgment. *See Monteiro v. City of Elizabeth*, 436 F.3d 397, 403 (3d Cir. 2006) (finding motive is a question of fact "that must be decided by the jury, which has the opportunity to hear the explanations of both parties in the courtroom and observe their demeanor"). Thus, insofar as Defendants argue the recommendation to terminate was based on Schwartz's recommendation in the Pepper Report, and was in no way connected to Dougherty's reports to the press, this is more properly viewed as a challenge to the factual issue of motivation. *See Reilly*, 532 F.2d at 232-33 (noting defendant's argument that his disciplinary recommendation was justified by the plaintiff's violation of department regulations and was not connected to the plaintiff's speech is "more properly viewed as a challenge to the factual issues of motivation and rebuttal").

Although the Pepper Report did not specifically reference the newspaper stories and reach a conclusion on the source of the leaks, Dougherty has produced sufficient evidence to

create a genuine factual issue as to whether his role or suspected role in the leaks was a substantial or motivating factor in Defendants decision to recommend his termination. Thus, a jury hearing about the circumstances of the camera project, Ackerman's anger regarding the newspaper articles, the nature of the Pepper investigation, the Pepper Report and the rationale given for Dougherty's suspension and termination could reasonably conclude that Defendants' actions were improperly motivated by Dougherty's protected speech.

Furthermore, Dougherty has presented sufficient evidence for a reasonable jury to conclude that Defendants were aware of the First Amendment implications of their actions based on the District's General Counsel's claim to have discussed Dougherty's alleged improper disclosures without regard to the newspaper stories, as well as Pepper Report's failure to contain a conclusion regarding the source of the leak, despite the fact that the Pepper investigators had been tasked with finding the leak. The absence of any references to the leak by the Defendants in their discussion of Dougherty's termination allows for an inference that Defendants knew they were infringing on Dougherty's First Amendment rights and consciously avoided discussing the press leaks. Additionally, The Pepper Report emphasized that Dougherty sent the emails the same day he perceived his boss insulted him in reaching the conclusion that Dougherty improperly disclosed information. Based on these facts a reasonable jury could infer Defendants were improperly motivated as they were aware Dougherty leaked information to the press and his speech was protected.

Dougherty also maintains he committed no violation of the Code of Ethics, since sending District documents to his personal email accounts was not a violation and, insofar as he did leak information, he was exempt from the confidentiality provision as a whistleblower. The District's Code of Ethics provided a clear exception for whistleblowers. Dougherty argues this was a

general and broad whistleblower exception, providing protection for reports both to law enforcement and the press. Nothing in the language of the provision itself limited it to reports to law enforcement. Matthews, the most senior human resources administrator, testified she was not sure what the whistleblower exception covered, or if reports about wrongdoing to the press were excluded. Thus, a reasonable jury could conclude the whistleblower exception was broad enough to cover Dougherty's reports to the press, put Defendants on notice that Dougherty's speech was protected, and that Defendants specifically avoided discussing their belief that Dougherty was the press leak in order to avoid a charge of First Amendment retaliation.

Accordingly, material questions of fact exist as to whether Defendants' motive for recommending Dougherty's termination resulted from his protected speech or was permissibly motivated by a belief he had breached District policy. To the extent these questions must be resolved by a trier of fact, it would be improper to determine this matter via summary judgment.

The final factor in determining the establishment of constitutional violation based on First Amendment retaliation is whether the employer would have taken the adverse action even if the employee had not engaged in the protected conduct. *Gorum*, 561 F.3d at 185. Because this factor is a jury question, the parties made no arguments regarding this defense, and Dougherty has made a sufficient showing of improper motivation to put the issue before a jury, this Court finds Dougherty has established a constitutional violation.

Having sufficiently established a constitutional violation, the Court now addresses whether that right was clearly established. As an initial matter, Defendants argue the right was not clearly established, such that a reasonable official would have been aware his conduct was unlawful, because there is no evidence Defendants ever concluded Dougherty was the source of the press leak. Defendants thus argue Dougherty's claim of retaliation is based solely on

speculation and the totality of the evidence is insufficient to raise a genuine issue regarding improper motive. As established above, this Court disagrees and finds that he has established a constitutional violation such that his termination was improperly motivated by his protected speech.

Defendants next argue that even accepting as true that the grounds given for Dougherty's termination were pretextual and retaliatory, and Defendants violated Dougherty's First Amendment right to be free from retaliation for speaking to the press, they are still entitled to qualified immunity because Dougherty cannot establish the law was clearly established at the time Defendants made the recommendation to terminate Dougherty's employment. A right is clearly established for qualified immunity purposes where the right is sufficiently clear "that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Therefore, the pertinent question is whether the law gave "fair warning" to the public official, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), and "whether it would be clear to a reasonable official that his conduct was *unlawful in the situation he confronted.*" *Rivas v. City of Passaic*, 365 F.3d 181, 200 (3d Cir. 2004) (quoting *Saucier*, 533 U.S. at 202) (emphasis added).

Defendants first argue Dougherty's First Amendment right was not clearly established because "it is not obvious from the 'general principles' and language of the relevant constitutional provision that Dr. Ackerman's ability to discipline senior management for actions within the scope of employment and violating the employee's code of conduct was unconstitutional." Antognoli's Mot. for Summ. J., at 12, ECF. No. 139. As set forth above, viewing the facts in the light most favorable to Dougherty, his activities did not fall within the scope of his duties, nor did he violate the employee code of conduct. Additionally, Defendants

cite to *Díaz-Bigio v. Santini*, 652 F.3d 45, 51 n.2 (1st Cir. 2011), for the proposition that "retaliation . . . is not expressly referred to in the Constitution"; however, as will be addressed below, there is significant case law establishing retaliation based on protected speech violates the Constitution and *Díaz-Bigio* itself states that even though retaliation is not expressly referred to in the Constitution, it is still actionable. *Id.*

Defendants next argue there are no cases providing sufficient guidance on the applicable legal principles where adverse action was taken against an employee for protected activity that was also a legitimate violation of the conditions of employment. It is disputed whether or not Dougherty's action violated the conditions of his employment;[13] thus, for purposes of summary judgment, viewing the facts in the light most favorable to Dougherty, the Court considers Dougherty's protected speech to the press as Defendants' primary motivation for his termination.

Defendants argue that even if they were acting in retaliation, the case law establishes that where an employee's speech causes great disruption, termination is often justified such that they could reasonable have believed they could lawfully terminated Dougherty's employment. *See Sprague*, 546 F.2d at 560; *Grigsby*, 157 F. App'x at 543; *Curinga*, 357 F.3d at 313 n.7. The cases Defendants rely on are factually distinct from the facts at issue here because the plaintiffs in those cases were challenging their direct supervisors, making the likelihood of disruption greater. Moreover, viewing the facts in the light most favorable to Dougherty, given the nature of his speech and the significant public interest in such information, and given the nature of Dougherty's relationship Ackerman, Nunery, and Matthews, the Court finds that a reasonable official should have been on notice that this speech was protected.

---

[13] Dougherty maintains there was no rule against taking work home, and regardless, there was an exception to the confidentiality provision for whistleblowers. Accordingly, for purposes of summary judgment the Court finds Dougherty's actions did not violate the Code of Ethics.

For reasonable officials to be on notice that their conduct would be unlawful, there need not be a "previous precedent directly on point." *Acierno v. Cloutier*, 40 F.3d 597, 620 (3d Cir. 1994) (quoting *Good v. Dauphin Cnty. Soc. Servs. for Children and Youth*, 892 F.2d 1087, 1092 (3d Cir. 1989)). Rather, there need only be "some but not precise factual correspondence between relevant precedents and the conduct at issue," *Pro v. Donatucci*, 81 F.3d 1283, 1291 (3d Cir. 1996), so that "in light of pre-existing law the unlawfulness [would be] apparent." *Anderson*, 483 U.S. at 640. There is case law establishing both a public employee's right to speak out on issues of public concern and to be free from retaliation for exercising that right. *See Bennis v. Gable*, 823 F.2d 723, 733 (3d Cir. 1987) (stating the law was clearly established that a public employee could not be retaliated against for exercising his rights under the First Amendment); *Watters*, 55 F.3d at 891 ("[I]t is essential that public employees be able to speak out freely on questions of public concern without fear of retaliatory dismissal."); *Holder v. City of Allentown*, 987 F.2d 188, 195 (3d Cir. 1993) (finding an employee had a right to speak on an issue of public concern where the speaker sought to "bring to light actual or potential wrongdoing or breach of public trust" on the part of government officials). In particular, there is case law establishing "speech disclosing public officials' malfeasance is protected." *Swineford*, 15 F.3d at 1271.

Viewing the facts in the light most favorable to Dougherty, his speech to the press was an attempt to expose alleged malfeasance by a government official. This type of speech is given great protection by the courts, and the case law put Defendants on notice that a public employee cannot be retaliated against for exercising this right under the First Amendment. Because the issue of Defendants' motivation for recommending Dougherty's termination is disputed, accepting that Defendants retaliated against Dougherty for leaking information to the press in

violation of his First Amendment rights, they are not entitled to qualified immunity because they were on notice that this activity was protected and that they could not retaliate against Dougherty for exercising his right to speak.  Accordingly, Defendants motion for summary judgment on the issue of qualified immunity is denied.


BY THE COURT:


_____/s/ Juan R. Sánchez_____
Juan R. Sánchez, J.