IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANCIS X. DOUGHERTY | : | CIVIL ACTION |
| | : | |
| v. | : | No. 12-1001 |
| | : | |
| THE SCHOOL DISTRICT OF | : | |
| PHILADELPHIA, et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                **May 18, 2015**

      Plaintiff Francis X. Dougherty brought suit against the School District of Philadelphia and three School District officials—Dr. Arlene Ackerman, Ms. Estelle Matthews, and Dr. Leroy Nunery—alleging violations of his First Amendment rights pursuant to 42 U.S.C. § 1983 and the Pennsylvania Whistleblower Law. Dougherty alleged the School District officials suspended him or recommended his termination, and the School Reform Commission (SRC) terminated his employment, after he spoke to the press and law enforcement regarding misconduct related to the award of a contract for the installation of security cameras. The case proceeded to trial on March 9, 2015.

      Before trial commenced, the parties stipulated that issues of liability and non-economic compensatory damages would be tried to the jury and issues of past and future lost earnings would be tried to the bench. Following a seven-day trial, the jury returned a verdict favorable to Dougherty on the First Amendment claim, finding Dougherty's protected activity was a substantial or motivating factor in the School District, Ackerman, and Matthews's suspension of him and/or recommendation of termination to the SRC. The jury awarded nominal damages.[1] Beginning on March 31, 2015, the Court held a two-day damages hearing to determine

---

[1] The jury found no violation of the Pennsylvania Whistle Blower Law by any Defendant.

Dougherty's economic damages, during which Dougherty and Andrew Verzilli, an expert economist, testified in favor of damages. The Court also heard testimony from Michael Davis, the School District's General Counsel. After the hearing, the parties submitted letter briefs addressing whether the jury rendered a special or general verdict and the causation analysis for Plaintiff's damages. For reasons set forth in this Memorandum, the Court will enter judgment of $318,520 in favor of Dougherty and against the School District, Ackerman, and Matthews.

**FINDINGS OF FACTS**

1. Prior to trial, the parties stipulated that issues of liability and non-economic compensatory damages would be tried to the jury and issues of economic damages (i.e., front and back pay) would be tried to the bench.

2. Before he was actually terminated by the SRC, Dougherty believed his termination was imminent because he had been placed on suspension. He therefore applied to other positions and indicated a willingness to accept a lower salary.

3. Dougherty was informed via a March 30, 2011, letter from Matthews that the School District would be recommending his termination.

4. The SRC terminated Dougherty via April 27, 2011, resolution.

5. The SRC approved all but three recommendations of termination made by the School District in 2010 or 2011.

6. In each of the three recommendations of termination rejected by the SRC in 2010 or 2011, the employee appealed the recommendation of termination.

7. In 2010 and 2011, the SRC received approximately thirty recommendations of termination from the School District each month.

8. The Court draws a negative inference from Defendants' non-production of records demonstrating the SRC rejected a School District recommendation of an employee's termination in 2010 or 2011 absent an employee appeal, in response to Plaintiff's March 17 and March 23, 2015, subpoenas requesting such information. Accordingly, the Court finds there is no evidence that the SRC rejected any recommendations of termination made by the School District when the employee failed to appeal in 2010 or 2011.

9. Dougherty suffered no economic losses when he was suspended by the School District on December 13, 2010, up to his termination on April 27, 2011, as he continued to be paid his ordinary salary by the School District.

10. When Dougherty was terminated, he was Acting Chief of Operations and Deputy Chief Business Officer for Operations, and his base salary for the fiscal year was $140,000.

11. On July 1, 2011, all School District employees at Dougherty's pay grade were given an automatic six percent salary reduction and four unpaid furlough dates. However, these employees were not subject to a reduction in force.

12. With the six percent salary reduction and four unpaid furlough dates, Dougherty's adjusted base salary for the fiscal year in which he was terminated was $135,548.

13. At the time Dougherty was terminated, he supervised the following operating departments/functional areas: facilities, capital programs, employee support, transportation, food services, and information technology (IT).

14. Each fiscal year, the School District issues a consolidated budget, or "budget book," a forward-looking document detailing the anticipated budgets for each department or area in the School District for the upcoming fiscal year.

15. The School District's fiscal year runs from July 1 through June 30.

16. Dougherty supervised staff members who compiled the budget for the operating departments/functional areas under his supervision, and he passed that information on the Chief Financial Officer and Budget Office. Additionally, during the regular course of his work Dougherty consulted the budget book.

17. Dougherty was familiar with and competent to read School District budget books.

18. The budget books issued by the School District after Dougherty's termination did not meaningfully differ in format from those issued by the School District prior to Dougherty's termination.

19. The budgets proposed in the budget book are subject to change during the fiscal year. The following year's budget book contains an "adopted budget" column, which indicates the actual budget for a particular area for the previous fiscal year.

20. The School District underwent restructuring in the years following Dougherty's termination; however, Dougherty's position or the functional equivalent of Dougherty's position has continued to exist.

21. For instance, the budget book for fiscal year 2011-12 (the year after Dougherty was terminated) contained a position for Deputy Chief Officer for Operations, at a proposed salary of $144,200 annually. That person supervised facilities, food services, transportation, capital programs, and procurement. The adopted budget for fiscal year 2012-13 confirms this position existed during the 2011-12 fiscal year.

22. As of July 15, 2014, Fran Burns has held the position of the School District's Chief Operating Officer at the salary of $175,000 annually. The position Burns occupies is the functional equivalent of Dougherty's position. Burns supervises procurement, facilities, food services, transportation, warehouse-distribution, and capital programs.

23. Dougherty would have remained employed by the School District of Philadelphia on October 3, 2013, if he had not been terminated, and would have become vested in the Public School Employees' Retirement System (PSERS) on that date.

24. Starting from October 3, 2013, Dougherty would have earned a pension benefit of "2.5% * final average salary * years of service."

25. Dougherty expected to continue in his position until retirement. Thus, if he had not been terminated from his position by the SRC, he would still be working at the School District.

26. Although Davis testified the School District would have terminated Dougherty in 2013 during the pendency of this litigation due to discovery of Dougherty's conveyance of confidential information to the press, the Court finds Davis's testimony not credible. First, the Court finds it implausible that Davis only discovered Dougherty's communications with the press in 2013 given testimony during the jury phase that School District officials were aware of the identity of the "leaker" before Dougherty was recommended for termination and the jury's rejection of Defendants' "same decision" defense. Second, the Court finds that Davis could not have recommended Dougherty's termination on this ground because it would have, as the jury found in this case, violated Dougherty's First Amendment rights.

27. Andrew Verzilli, an expert economist, is qualified to give expert opinions on Dougherty's lost wages.

28. Since February 2012, Dougherty has been employed by the City of Allentown, beginning at a salary of $95,000 annually. As of January 2015, his salary increased to $118,450 annually. As a part of his present employment, Dougherty participates in the Pennsylvania Municipal Retirement System (PMRS).

29. Dougherty's economic losses from April 27, 2011, to the beginning of trial, as calculated by Verzilli utilizing a base salary of $135,548 and a discount rate of 4%, are $215,920.

30. Dougherty's economic losses from April 2015 through the end of August 2016, as calculated by Verzilli utilizing a base salary of $135,548 and a discount rate of 4%, are $102,600.

31. Verzilli's calculations appropriately account for Dougherty's mitigation vis-à-vis his new position with the City of Allentown and his investiture in PMRS.

32. Because Verzilli assumed a high discount rate and a lower base salary than Dougherty's original base salary for fiscal year 2010-2011, his estimate of Dougherty's economic losses are conservative. [2]

**DISCUSSION**

The parties stipulated prior to trial that the Court would determine Dougherty's economic damages, if any. Defendants now challenge the authority of the Court to do so, arguing (1) front and back pay are a form of equitable relief the jury should have determined, (2) the Court cannot sit as a factfinder regarding causation of damages absent a jury finding that Defendants actually or constructively discharged Plaintiff, and (3) the Court is not empowered to decide any issues of fact not submitted to the jury pursuant to Federal Rule of Civil Procedure 49(a)(3).[3] Defendants also argue that Plaintiff has not proved Defendants proximately caused his economic damages.

---

[2] Verzilli assumed a discount rate of 4%, based on forecasted yields for short-term treasury securities prepared by the Congressional Budget Office, as well as average yields over the past 25 years.

[3] Defendants first argued the Court could not determine Plaintiff's front and back pay damages, if any, in their March 27, 2015, Motion in Limine. Then, at the damages hearing, defense counsel moved under Rule 50(a) for judgment as a matter of law on the issue of Plaintiff's entitlement to front and back pay.

The Court may determine Dougherty's entitlement to lost past and future pay and award such relief if warranted because the parties agreed the Court would determine his economic damages. Alternatively, the Court may determine Dougherty's economic damages because it may decide any issues of fact not submitted to the jury pursuant to Rule 49(a)(3). And because the Court finds a preponderance of the evidence shows Defendants' retaliatory actions proximately caused Dougherty's economic damages, it will award damages in his favor.

### A. Type of Damages Sought

The parties disagree as to whether Dougherty's economic losses are properly characterized as compensatory damages or as front and/or back pay. Defendants maintain that Plaintiff's losses constitute back pay and front pay, i.e. forms of equitable relief available only when the jury has determined a plaintiff was wrongfully discharged. Defs.' Mot. in Limine 4, ECF No. 211;[4] Defs.' Trial Br. 3, ECF No. 222. Dougherty argues the distinction is irrelevant because he waived jury trial on the economic losses he claims (back and front pay), and the parties agreed the Court would decide those losses. Pl.'s Trial Br. 1 n.4, ECF No. 224. The Court acknowledges it has not always expressly called Dougherty's losses compensatory damages. *See* March 11, 2015, Am. Order, ECF No. 183 (noting the Court would "separate the trial on the issues of back pay and front pay from the trial on the issues of liability [and] non-economic compensatory damages," such that "issues of liability and non-economic compensatory damages" would be tried to the jury, and if necessary, "issues of past and future lost earnings"

---

[4] Defendants make two additional arguments in their motion in passing: (1) because the individual Defendants did not terminate his employment, the Court need not consider whether Plaintiff is entitled to lost wages, and (2) back pay and front pay are equitable remedies not needed to make Plaintiff whole, so they should be denied. That the individual Defendants themselves did not terminate Dougherty's employment does not insulate them from Dougherty's entitlement of damages, as the inquiry here is whether their actions proximately caused Dougherty's termination and corresponding lost wages. The relevant causation analysis is addressed *infra* Section D. The classification of the remedy sought is addressed *infra* Section A.

would be tried to the bench); *see also* Jury Instructions 33 (defining, in the compensatory damages instruction, "back pay and front pay" as the wages Plaintiff would have earned in the past or future if he had continued employment with the School District and instructing the jury not to award damages for those wages as the determination would be for the Court).

The Court finds, however, that whether these economic losses are technically compensatory or equitable remedies is irrelevant, as the parties agreed prior to trial the Court would determine them. *See* March 11, 2015, Am. Order, ECF No. 183. The most natural reading of the stipulation is that the parties wanted to separate the determination of non-economic damages from economic damages. The stipulation evinces no desire to separate economic compensatory damages from economic equitable relief. Defendants moreover agreed to have the jury determine non-economic compensatory damages (i.e. emotional damages) resulting from Dougherty's job loss. *See id.* ¶ 5 (stipulating Dougherty could offer in his proof of non-economic compensatory damages "evidence of the fear he experienced from being out of work"). The stipulation therefore acknowledges that economic damages caused by Dougherty's job loss are properly an issue for the Court in this case.

**B. Determining Damages Generally**

Because 42 U.S.C. § 1983 creates a "species of tort liability" designed to compensate a plaintiff for injuries caused by violations of her constitutional rights, "the level of damages is ordinarily determined according to principles derived from the common law of torts." *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306-07 (1986) (noting § 1983 damages may include "out-of-pocket loss and other monetary harms"); *Carey v. Piphus*, 435 U.S. 247, 257 (1978) (instructing "damages awards under § 1983 should be governed by the principle of compensation"). "If a plaintiff establishes that the exercise of his First Amendment rights played

some substantial role in the relevant decision, he is entitled to the extent practicable to be put in the same position that he would have been in had he not engaged in that protected conduct." *Suppan v. Dadonna*, 203 F.3d 228, 236 (3d Cir. 2000) (finding the plaintiffs were "entitled to relief with respect to any injury or loss that resulted" from the defendants' violation of their First Amendment rights).

The jury determined that Defendants retaliated against Dougherty's exercise of his First Amendment rights by suspending him and/or recommending his termination and rejected Defendants' defense that they would have done the same even in the absence of Dougherty's First Amendment protected activity. *See* Verdict Slip 1-2, ECF No. 206. Because the parties stipulated that the Court would be the factfinder for the purposes of economic damages, the Court must determine what relief would put Dougherty in the same position he would have otherwise occupied had Defendants not retaliated against his protected conduct. *See Suppan*, 203 F.3d at 236.

Determination of damages ordinarily encompasses an analysis of causation. *See* Third Circuit Model Civil Jury Instruction 4.8.1 (2011) ("[Plaintiff] must show that the injury would not have occurred without [defendant's] act . . . . [Plaintiff] must also show that [defendant's] act . . . played a substantial part in bringing about the injury, and that the injury was either a direct result or a reasonably probable consequence of [defendant's] act."); *see also ConsulNet Computing, Inc. v. Moore*, 631 F. Supp. 2d 615, 620 (E.D. Pa. 2008) (permitting in the bench phase of a bifurcated copyright action, where liability was determined by the jury and damages were to be determined by the court, additional causation evidence indicating the extent of damages attributable to the defendants).

Defendants reference numerous Title VII cases in support of their proposition that without a direct jury finding of discharge or constructive discharge, Dougherty is not entitled to lost pay. While the Third Circuit has found "relief under section 1983 employment discrimination suits to be analogous to that applicable to successful claimants under Title VII," it has also counseled against assuming "parity in remedy between Title VII cases and all cases brought under 42 U.S.C. s. 1983." *Gurmankin v. Constanzo*, 626 F.2d 1115, 1122-23 (3d Cir. 1980). At least one other district court has found it would be improper to import Title VII precedents regarding constructive discharge into a § 1983 case. *See Glass v. Snellbaker*, No. 05-1971, 2008 WL 4371760, at *15 (D.N.J Sept. 17, 2008). In that case, the plaintiff, who was formerly Deputy Chief of the Atlantic City Police Department, brought claims against the police chief and Atlantic City for violations of the First Amendment. The jury found both defendants violated the plaintiff's right to engage in protected activity, the plaintiff suffered adverse employment action (transfer to an administrative position), and his retirement was involuntary as a result of Defendants' adverse employment action. Because the plaintiff did not plead a separate constructive discharge claim, Defendants claimed in post-verdict motions that he was not entitled to seek damages for lost pay and benefits after his resignation. Not only did the *Glass* Court find Defendants had waived this argument by failing to timely object, but also that the policies undergirding Title VII remedies were inapplicable to a First Amendment retaliation case[5] and

---

[5] The *Glass* Court explained at least one purpose of Title VII is to "encourage resolution of employment issues in place, that is, to encourage exhaustion of all remedies short of litigation," which is why Title VII plaintiffs must generally prove constructive discharge in order to prevail. 2008 WL 4371760, at *15 n.3. In contrast, § 1983 provides "a broader range of legal remedies, unconstrained by requirements to exhaust available remedies before seeking judicial relief," and "the redress of violation[s] of First Amendment rights arising under Section 1983 has no analog in Title VII, which is designed to redress discrimination in employment due to personal characteristics such as race and gender." *Id*.

there was ample evidence the plaintiff had no choice but to resign. That Court also specifically upheld post-resignation damages absent a finding (or pleading) that Defendants actually discharged the plaintiff.

This Court likewise finds no reason to import Title VII precedent into the § 1983 context when no § 1983 caselaw affirmatively suggests the necessity of pleading actual or constructive discharge or having the jury find the same before compensatory damages are available in a First Amendment retaliation action.

### C. Determining Damages Using Federal Rule of Civil Procedure 49(a)(3)

Even if the jury should have been the factfinder in determining whether Defendants' actions caused Plaintiff's damages, the Court is empowered by Federal Rule of Civil Procedure 49(a)(3) to fill in the missing findings of fact as to whether Defendants' actions caused Dougherty's ultimate economic losses. Rule 49 offers two alternatives to the general jury verdict. *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1056 (3d Cir. 1991). Pursuant to Rule 49(a), the Court may require the jury to return a special verdict, which comprises "written responses to separate questions concerning the factual issues in dispute," while pursuant to Rule 49(b), the Court may request a general verdict with written interrogatories. *Id*. If the jury renders a special verdict under Rule 49(a), "a party waives the right to a jury trial on any issue of fact raised by the pleadings or evidence but not submitted to the jury unless, before the jury retires, the party demands its submission to the jury. If the party does not demand submission, the court may make a finding on the issue." Fed. R. Civ. P. 49(a)(3); *see also Kinnel v. Mid-Atlantic Mausoleums, Inc.*, 850 F.2d 958, 965 (3d Cir. 1988) (holding Rule 49(a) "was designed to have the court supply an omitted subsidiary finding which would complete the jury's determination or verdict").

The Court finds that the jury returned a Rule 49(a) special verdict. The verdict sheet provided to the jury in this case was compiled after substantial input from both Plaintiff and Defendants.[6] No interrogatory on the sheet permitted the jury to return a general verdict for either party. Rather, the jury was required to make a written finding upon each issue of fact, including non-economic compensatory damages. Further, in its instructions, the Court did not tell the jury to make a general finding for Plaintiff or Defendants. While the Court instructed the jury that the verdict must be for Defendants on the First Amendment claim if they found Defendants proved their "same decision" defense by a preponderance of evidence, no written interrogatory asked the jury to make an ultimate finding of liability alone, nor was there space on the slip for such a finding. *See Simmons*, 947 F.2d at 1054 & n.6 (determining the jury returned a 49(a) verdict even though the verdict slip instructed the jury to award compensatory damages if it found one or more of the defendants' actions were a legal cause of harm to the plaintiff);[7] *see*

---

[6] As is the Court's usual practice, the Court requested that Plaintiff and Defendants submit a joint proposed verdict slip prior to trial for the Court's consideration. In that submission, the parties noted their fundamental disagreement as to the form of the verdict slip. Specifically, Defendants sought "specific interrogatories regarding the requisite findings that must be made by the jury to reach a verdict for each claim and separate interrogatories for the affirmative defenses to the claims and for damages" while Plaintiff sought "a single interrogatory as to each claim and damages." Proposed Joint Verdict Sheet 1 n.1, ECF No. 108. The Court subsequently conferred with the parties several times before the verdict slip was finalized. At no point did Defendants ask the Court to insert an interrogatory instructing the jury to determine whether Plaintiff proved Defendants proximately caused his economic losses, although they were aware such a question could be asked. *See infra* n.9.

[7] The verdict slip submitted to the jury here strongly resembles what was deemed to be a special verdict slip in *Simmons*, a case in which the estate of a detainee who hanged himself in jail sought damages under § 1983 and state law against the officer on duty as well as the City of Philadelphia. The *Simmons* jury was first asked whether the officer deprived the decedent of his constitutional rights and committed a tort against the decedent, and then posed the same questions with regards to the City. Next, it was asked whether the defendants' actions were the legal cause of harm and whether the officer acted maliciously or wantonly. Finally, the jury was instructed to award damages if appropriate. Although the *Simmons* Court recognized the verdict sheet did not strictly conform to either type of Rule 49 verdict, it noted the sheet was "strikingly

*also Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 734 F.2d 133, 144 & n.3 (3d Cir. 1984) (holding a verdict form asking the jury to determine liability as to each of the four defendants separately and providing an interrogatory for the jury to award compensatory damages if it found at least one defendant liable was "more properly" considered under Rule 49(a)). *But see Stanton by Brooks v. Astra Pharma. Prods., Inc.*, 718 F.2d 553, 574 (3d Cir. 1983) (determining a verdict slip instructing the jury to indicate the amount of compensatory damages it wished to award if it determined that any of the defendants were liable expressly required the jury determine ultimate liability and rendered the slip a 49(b) verdict); *Tarkett, Inc. v. Congoleum Corp.*, 156 F.R.D. 608, 612 n.7 (E.D. Pa. 1994) (determining a verdict sheet consisting of 24 interrogatories and a detailed explanation of the general verdicts the jury could reach was a general verdict).

Even if the jury verdict were a Rule 49(b) verdict, the Court could still fill in the missing factual question of whether Defendants' actions proximately caused Plaintiff's termination and damages. Rule 49(b) is mute as to issues not submitted to the jury. Defendants would have the Court draw a sharp distinction between Rule 49(a) and (b), but "there is 'no reason in logic or policy so to distinguish between Rule 49(a) and Rule 49(b).'" *McLaughlin v. Fellows Gear Shaper Co.*, 786 F. 2d 592, 597 (3d Cir. 1986). Rule 49(b) procedures have been applied to Rule 49(a) verdicts. *See, e.g., Stanton by Brooks*, 718 F.2d at 575 (holding that although only 49(b) expressly authorizes the resubmission of inconsistent answers to special interrogatories to the jury, a court may do the same under Rule 49(a)). And the Court sees no reason why it cannot apply a Rule 49(a) procedure to a Rule 49(b) verdict, especially when Defendants have had

---

similar" to interrogatories the court had decided comprised special verdict interrogatories under Rule 49(b) in other cases, and "more importantly," the court could not discern, in looking to the "totality of the district court's instructions," any intent that the jury should conform the verdict to Rule 49(b). 947 F.2d at 1058.

multiple opportunities to demand submission of the relevant causation question to the jury.[8] Secondly, it would be inequitable for Defendants to attack the verdict as insufficient when they could have and failed to raise its insufficiency before the Court dismissed the jury.[9] *See Lewis v. Donley*, No. 3:06-cv-0053, 2011 WL 1343339, at *4 (D. Alaska Apr. 8, 2011) (holding that because the plaintiff did not demand that the jury be instructed to identify which specific adverse employment actions the defendant took against the plaintiff, the court could make a finding on

---

[8] The Third Circuit has drawn a distinction between Rule 49(a) and (b) for the purposes of preserving grounds for appeal. Although it is probably necessary in this Circuit to object to inconsistencies in a 49(b) verdict slip before the jury's dismissal to preserve the error for appeal, *Simmons*, 947 F.2d at 1056-57, there no clear authority as to whether a party waives appellate review of special verdict under Rule 49(a) when that party fails to object at the district court. *See Jacobs v. City of Philadelphia*, 2005 WL 1899499, at *11 & n.11 (E.D. Pa. Aug. 8, 2005) (recognizing conflicting authorities). *Compare Simmons*, 947 F.2d at 1058 (holding a party need not object to inconsistencies in a special verdict under Rule 49(a) in order to have preserved for appeal its argument that it was entitled to judgment notwithstanding the verdict), *and Malley-Duff & Assocs, Inc.*, 734 F.2d at 145 (stating "no decision of this court has precluded appellate review of inconsistencies under a Rule 49(a) verdict in the absence of an objection before the jury was discharged), *with Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446, 463 (3d Cir. 1999) (holding the defendant's failure to object to the verdict sheet before the jury was discharged constituted a waiver of an objection that the verdict provided no grounds for awarding punitive damages), *Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 200 (3d Cir. 1995) (holding that a defendant waives her objections when the verdict form is submitted to counsel and defendant "fails to object to the form and language of special verdict form[] . . . before closing arguments or at the close of charging before the jury retires to deliberations"), *Hershowitz v. Nutri/System, Inc.*, 857 F.2d 179, 188-89 (3d Cir. 1988) (holding the shareholders' argument that the district court committed prejudicial error in formulating special verdict interrogatories was waived under Rule 49(a) because the objections were not made to the court before the jury retired), *and United States v. Palmeri*, 630 F.2d 192, 202 n.8 (3d Cir. 1980) ("In civil trials, failure to present a timely objection to the specific wording of the interrogatories results in waiver.").

[9] Question 10 on Defendants' proposed verdict sheet suggested asking the jury whether "Plaintiff proved . . . any damages he suffered were caused by one or more Defendant's retaliation for activity protected by [the law]." Proposed Joint Verdict Sheet 6, ECF No. 108. The proposed question indicates Defendants were aware of a potential deficiency in the verdict sheet should this causation question not be posed to the jury, yet Defendants did not raise this deficiency with the Court even though the Court revised the verdict sheet multiple times and provided it for the parties' review each time.

the issue). Thus, the Court may use Rule 49(a) to complete the causation analysis Defendants could have, but did not, demand the jury perform.

### D. The Causation Analysis

The jury found Defendants suspended Dougherty in violation of the First Amendment, recommended Dougherty's termination in violation of the First Amendment, or did both. A preponderance of the evidence shows either violation proximately caused Dougherty's termination by the SRC; moreover, Dougherty's termination would not have occurred without Defendants' actions, Defendants' actions played a substantial part in bringing about his termination, and his termination was both a direct result and a reasonably probable consequence of Defendants' actions. *See* Third Circuit Model Civil Jury Instruction 4.8.1 (2011) ("[Plaintiff] must show that the injury would not have occurred without [defendant's] act . . . . [Plaintiff] must also show that [defendant's] act . . . played a substantial part in bringing about the injury, and that the injury was either a direct result or a reasonably probable consequence of [defendant's] act."). Thus, Dougherty has demonstrated Defendants' actions caused his economic losses.

A natural consequence of Dougherty's suspension was Defendants' recommendation of termination. Testimony during the jury trial indicated Defendants suspended Plaintiff and five other employees because they did not want potential "leakers" to speak to the press about the Pepper Hamilton investigation. Matthews's December 13, 2010, letter suspending Dougherty says as much. *See* Trial Exh. 28 (noting the investigation was necessary "as a result of an apparent inappropriate sharing of confidential District information" and warning Dougherty to "refrain from any communication with District employees and the media about this matter"). Dougherty testified that as he was being handed his suspension letter, he told Matthews he was

the leak; Matthews's recollection was somewhat different, but she recalled Dougherty responding he had "his own investigation . . . being done by the FBI," indicating Defendants had some knowledge Dougherty was the leaker by December 2010. Trial Tr. 96:1-11, Mar. 11, 2015 (testimony of Estelle Matthews). Further, during his suspension, Dougherty refused to cooperate with the investigation conducted by Pepper Hamilton attorney Michael Schwartz, and Dougherty's attorney, Lisa Matthewson, told Schwartz that Dougherty was claiming whistleblower status. *See* Trial Exh. 86. Testimony during trial further indicated that as a result of Dougherty's refusal to cooperate with the investigation, Defendants determined discipline, namely a recommendation of termination, was appropriate. Bolstering this finding, the Court notes that during the damages hearing, General Counsel Davis testified that discovery materials for this case indicating that Dougherty had provided confidential budgeting information to the press confirmed for him that his 2011 decision to recommend Dougherty's termination for his "egregious conduct" was proper. Damages Hr'g at 12:43:45 p.m., 12:47:45 p.m.

Next, a preponderance of evidence shows Defendants' recommendation proximately caused Dougherty's termination. Without Defendants' recommendation, the SRC could not have acted to terminate Dougherty by law. Because the evidence shows the SRC essentially served as a rubberstamp for the recommendations of the School District, the SRC's ratification of the School District's recommendation was a foreseeable consequence of Defendants' recommendation. During the jury trial, there was testimony that at least two or three employees' recommendations of termination by the School District were not ratified by the SRC via resolution. In response to post-trial subpoenas, Defendants produced records they certified as related to eight instances in 2010 or 2011 during which the SRC did not terminate an employee despite the School District's recommendation of termination. Of the eight records produced by

Defendants, however, only three were for employees terminated in 2010 or 2011, and unlike Dougherty, all three employees appealed their recommendations of termination.[10] Testimony at trial showed that the SRC received approximately thirty recommendations of termination a month, or approximately 720 termination recommendations over two years. That the SRC rejected the School District's recommendations of termination at a rate of approximately 3 out of 720 supports Plaintiff's theory that the SRC merely served as a rubberstamp for the School District's recommendations.

Finally, the Pepper Report issued by Schwartz was not an intervening cause breaking the chain of causation between Defendants' suspension of Dougherty, their recommendation of termination, and the SRC's actual termination. Defendants argued to the jury they would have made the same decision to recommended Dougherty's termination based on the Pepper Report's finding that Dougherty had violated School District policy by sending confidential documents through his personal email, as well as Dougherty's refusal to meet with the Pepper investigators or School District officials. The jury, however, expressly rejected these two arguments when they found Defendants were not entitled to the same decision defense. Additionally, although there was testimony that the SRC was presented the Pepper Report two months before

---

[10] Of the three employees whose recommendations of termination by the School District were not ratified by the SRC, two were per diem school police officers who were terminated due to excessive absences. Both appealed their terminations and were granted administrative hearings before SRC hearing officer Jeffrey White. In each case, Officer White recommended reinstatement; the SRC adopted his findings of fact and conclusions of law regarding each employee on December 15, 2010, and reinstated both employees via resolution on the same date. The third employee was a probationary food services assistant. After that employee appealed, an administrative hearing was conducted before Officer White, and the employee was reinstated via SRC resolution on March 16, 2011.
    Of the other five records, three were for employees whose recommendations for termination were not ratified by the SRC outside of the relevant time period, and two of the records were for employees who appealed their recommendations of termination, after which the School District agreed they should be reinstated, effectively withdrawing its recommendation.

Dougherty's termination, no evidence was adduced that the SRC specifically considered the Pepper Report when adopting the resolution terminating Dougherty on April 27, 2011.

### E. The Damages Award[11]

Because Dougherty has proven by a preponderance of the evidence that Defendants proximately caused the economic damages he suffered from the loss of his job, the Court will award damages in Dougherty's favor in the amount of $318,520. This amount puts Dougherty in the position he would have occupied had he not engaged in protected activity, *see Suppan*, 203 F.3d at 236, and includes $215,920 in back pay from April 27, 2011, until the date of trial and $102,600 in front pay from the date of trial through the end of August 2016. As Verzilli testified, this damages estimate is conservative given the comparatively high discount rate assumed. Additionally, this figure fully accounts for Dougherty's mitigation through his current position with the City of Allentown and recognizes his investiture in that City's pension system.

**CONCLUSIONS OF LAW**

1. The Court may make a finding on causation and determine Dougherty's economic damages because the parties stipulated the Court would be the factfinder on the issues of economic damages.

2. Alternatively, because the jury returned a special verdict subject to Federal Rule of Civil Procedure 49(a) and Defendants failed to object to the missing causation interrogatory or

---

[11] Defendants contend that because the jury was instructed to determine compensatory damages but awarded Plaintiff none, the jury made a "resounding" determination that Defendants' acts did not play any substantial role in bringing about *any* alleged injuries and, thus, Dougherty cannot receive any compensatory damages. *See* Defs.' Omnibus Reply Mem. of Law 2, ECF No. 216. Defendants' contention Dougherty has no basis under the law to receive compensatory damages has been addressed *supra* Sections A-C. The Court also notes when instructing the jury regarding compensatory damages, the Court specifically instructed the jury not to consider Plaintiff's lost front and back pay. The only finding the jury made as to Plaintiff's compensatory damages therefore was either that Defendants' actions did not play a substantial role in bringing about non-economic injuries or that Plaintiff did not suffer non-economic injuries.

demand its submission to the jury before the jury's dismissal, Defendants have waived jury trial on that issue. Accordingly, the Court is empowered to make a finding on causation and Plaintiff's ultimate economic damages.

3. A preponderance of evidence shows that Plaintiff would not have been terminated absent Defendants' suspension of him and/or recommendation of termination to the SRC, and Defendants' suspension of him and/or recommendation of termination to the SRC played a substantial part in bringing about Plaintiff's job loss and resultant economic losses. A preponderance of the evidence shows Plaintiff's termination was both the direct result and/or a reasonably foreseeably result of Defendants' actions.

4. Therefore, a preponderance of the evidence demonstrates Defendants were the proximate cause of Dougherty's job loss and economic damages.

5. Neither the Pepper Report nor the SRC resolution was an intervening cause.

6. Dougherty is entitled to an award in the amount of $318,520.

An order entering judgment follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, J.